IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

CASE NO. 24-11410

---

C.B. by and through K.B. and S.B., K.B, and S.B.,

Appellants,

vs.

Henry County School District,

Appellee.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

---

**APPELLANTS' OPENING BRIEF**

---

*/s/ Craig Goodmark*
Craig Goodmark
Georgia Bar No. 301428
1425A Dutch Valley Place
Atlanta, Georgia 30324

Attorneys for Appellants

*/s/ Debra Haverstick*
Debra Haverstick
Georgia Bar No. 159026
1425A Dutch Valley Place
Atlanta, Georgia 30324

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fed. R. App. P. 26.1 and Rule 26.1-1 (a)(3) of the United States Court of Appeals for the Eleventh Circuit Rules, Appellant certifies that below is a complete listing of all persons who possess an interest in this case:

1.    C.B., a minor child who brings this case by and through their parents, K.B. and S.B.;

2.    K.B., parent of minor child C.B.

3.    S.B., parent of minor child C.B.

4.    Colum, Matthew Chase

5.    Goodmark, Craig

6.    Goodmark Law Firm, LLC

7.    Haverstick, Debra

8.    Henry County School District

9.    Rittle, Megan Murren

10.   Smith Welch Webb & Whit

11.   Zimring, Jonathan A.

12.   Zimring Law Firm

*C.B. et al. v. Henry Country School District, No. 24-11410*

I hereby certify pursuant to 11th Cir. R. 26.1-3(b) that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

*/s/ Craig Goodmark*
Craig Goodmark
Georgia Bar No. 301428
1425A Dutch Valley Place
Atlanta, Georgia 30324

## STATEMENT OF ORAL ARGUMENT

Appellants respectfully request an opportunity to present oral argument. This case involves important legal questions regarding the rights of students with disabilities and several nuanced concepts that arise within the Individuals with Disabilities Education Act (IDEA) relating to the rights of students and parents. Appellants respectfully submit that oral argument will significantly aid this Court's decisional process on specific points of law and pertinent parts of the record.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS.........................................................I

STATEMENT OF ORAL ARGUMENT................................................. IV

TABLE OF CONTENTS .................................................. V

TABLE OF AUTHORITIES.............................................................VIII

JURISDICTIONAL STATEMENT .................................................. XIV

STATEMENT OF THE ISSUES ..........................................................XV

STATEMENT OF THE CASE ................................................................1

   I.   STATEMENT OF THE FACTS ................................................................1

      A.  General Overview ...................................................................1

      B.  C.B.'s Placement and Progress in the 2018-2019 School Year..................2

      C.  May 14, 2019 IEP Meeting, the Change in Placement, and GAA ..............3

      D.  Due Process Hearing Request and Denial of Stay Put Rights ....................7

      E.  Due Process Hearing.................................................................8

      F.  The ALJ's Final Order and the Family's Petition for Review....................9

   II.  COURSE OF PROCEEDINGS AND THE DISTRICT COURT'S ORDER ....................11

   III.  STANDARD OF REVIEW .................................................................12

SUMMARY OF THE ARGUMENT ....................................................14

ARGUMENT AND CITATION OF AUTHORITY ............................................17

I. INTRODUCTION ................................................................................17

II. C.B.'S RIGHT TO A FAPE IN THE LRE ........................................18

   A. FAPE.............................................................................................18

   B. LRE..............................................................................................19

   C. How FAPE and LRE Intersect...................................................21

III. THE FAILURE TO EVALUATE C.B.'S LRE CLAIM IS ERROR BY BOTH THE ALJ AND THE DISTRICT COURT..............................................................22

   A. The ALJ Denied the Parents' IDEA Right to Challenge the Placement and Misunderstood LRE. ................................................................23

   B. The District Court Failed to Properly Assess the ALJ's Errors Regarding Placement and LRE. ................................................................27

   C. There was No Review of the Self-Contained Class and No Evidence of its Appropriateness for C.B. ........................................................27

     1) The District Court Failed to Consider Evidence that Resource was the Appropriate Placement for C.B. ..........................................30

     2) C.B.'s IEP and Past Performance Proved Resource was the Appropriate Placement. ..................................................31

     3) The Non-Academic Benefits of Language and Social Role Modeling Supported C.B.'s Placement in Resource.................................32

     4) The District Court's Analysis Should Have Addressed HCSD's Non-Compliant Placement and LRE Process.................................33

IV. RELIANCE ON HEARSAY STATEMENTS OF THE RESOURCE TEACHER AT THE IEP MEETING VIOLATED THE PARENT'S RIGHTS TO CONFRONT WITNESSES. .......35

V. THE DISTRICT COURT ERRED IN FINDING THE FAMILY'S GAA CLAIM IS MOOT.............................................................................................42

A.  The Alterative Testing is Still a Live Controversy that Would Evade Review – from Year to Year........................................................................44

B.  C.B. was Improperly Placed on the GAA....................................................47

CONCLUSION ..................................................................................................50

CERTIFICATE OF COMPLIANCE ....................................................................52

CERTIFICATE OF SERVICE..............................................................................53

# TABLE OF AUTHORITIES

**Cases**

A.B. v. Clear Creek Ind. Dist., 787 F. App'x 217 (5th Cir. 2019) .........................20

Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) ...............................................42

Anton International Corp. v. Williams-Russell and Johnson, Inc., 190 Ga. App.

150 (1989) ...............................................................................................36

Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley,

458 U.S. 176, 203 (1982) ...................................................18, 28, 37, 41 n. 29, 45

Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd. of

Educ., 41 F.3d 1162, 1168 (7th Cir. 1994) ..........................................................21

Bennett v. Walker Cnty Sch. Dist., 203 F.3d 1293 (11th Cir, 2001) ...................n.30

Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618,

621 (11th Cir. 1983) ..........................................................................................n. 22

Cobb Cnty. Sch. Dist., 112 LRP 43250, 22 ......................................................32, 34

Cobb Cnty. Sch. Dist., 119 LRP 37938, 37 ................................................ 30, 32-34

Cook v. Bennett, 792 F.3d 1294, 1299 (11th Cir. 2015) ..........................................43

C.P. v. Leon County Sch. Bd. Fla., 483 F.3d 1151, 1155 (11th Cir. 2007) ............12

Daniel R.R. v. State Bd. of Ed., 874 F.2d 1036, 1049

(5th Cir. 1989) .......................................................................... 14, 19-20, 34, 45

Devries v. Spillane, 853 F.2d 264, 268 (4th Cir. 1988) .....................................44, 46

Draper v. Atlanta Indep. Sch. Sys., 518 F.3d 1275, 1284 (11th Cir. 2008) ............13

Endrew F. v. Douglas Cnty Sch. Dist, 580 U.S. 386, 402 (2017).....................18, 34

Fla. Pub. Int. Research Grp. Citizen Lobby Inc. v. EPA, 386 F.3d 1070,

   1086 (11th Cir 2004) ............................................................................42

Girty ex rel. Girty v. Sch. Dist., Valley Grove, 163 F.Supp.2d 527, 535-37

   (W.D. Pa. 2001) ............................................................................34

Greer v. Rome City Sch. Dist., 950 F.2d 688, 695 (11th Cir. 1991)....14, 17, 19, 20,

   21, 23 n.15, 28, 28 n.19, 30, 35, 37, 50, 51

Honig v. Doe, 484 U.S. 305, 317 (1988)............................................................ 42-45

K.A. v. Fulton County Sch Dist., 741 F.3d. 1195, 1200 (11th Cir 2013) .......... 46-47

Knable v. Bexley, 238 F.3d 755, 768-70 (6th Cir. 2001).......................................37

Kruelle v. New Castle Cnty. Sch. Dist., 642 F.2d, 687, 695 (3d Cir. 1981) ...........22

Loren F. v. Atlanta Indep. Sch. Sys., 349 F.3d 1309, 1312-13 (11th Cir. 2003) ....18

L.H. v. Hamilton Cnty Dept. of Educ., 900 F.3d 779, 792-93

   (6th Cir. 2018)................................................................20, 30, 32, 34

Lee v. Biloxi Sch. Dist., 963 F.2d 837 (5th Cir. 1992) ...........................................46

Mavis v. Sobol, 839 F.Supp. 968, 987-88 (N.D.N.Y. 1994)...................................34

Mills v. Board of Ed. of Dist. of Columbia, 348 F. Supp. 866, 881

   (D.D.C. 1972)...........................................................................40, n. 29

Murphy v. Hunt, 455 U.S. 478, 482 (1982) ...........................................................43

M.T.V. v. DeKalb County Sch. 446 F.3d 1153,1158 (11th Cir. 2003)...................45

Neb. Press Assn v. Stuart, 427 U.S. 539, 541 (1976)................................................42

Preiser v. Newkirk, 422 U.S. 395, 401 (1975) .......................................................42

R.L. v. Miami-Dade Cnty. Sch. Bd., 757 F.3d 1173, 1181 (11th Cir. 2014)..........13

R.S. v. Montgomery Tp. Bd. of Educ., Civ. Act. No. 10-5265, 2012 WL 2119148

   at *4 (D.N.J. 2012)............................................................................................n. 14

Rome Sch. Comm. v. Mrs. B., 247 F.3d 29, 31 (1st Cir. 2001)...............................46

S.H. v. State Operated Sch. Dist. of the Cty of Newark, 336 F.3d 260, 272

   (3d Cir. 2003) ....................................................................................................21

Sacramento City Unif. Sch. Dist. v. Rachael H., 14 F.3d 1398, 1403

   (9th Cir. 1994)...................................................................................................46

Shaffer v. Weast, 546 U.S. 49, 54 (2005).................................................................40

Spencer v. Kemna, 523 U.S. 1, 17 (1998)................................................................43

T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 162

   (2d Cir. 2014)....................................................................................................21

Teague v. State, 252 Ga. 534, 536 (1984)................................................................38

U.S. v. Parry, 649 F.2d 292, 295 (5th Cir. 1981) ....................................................37

U.S. v. Sallins, 993 F.2d 344, 346 (3d Cir. 1993) ...................................................37

U.S. v. Sineneng-Smith, 590 U.S. 371, 376 (2020) .................................................24

Woodruff v. Woodruff, 272 Ga. 485, 531 S.E.2d 714 (2000)..................................36

## Statutes

20 U.S.C. § 1400(d)(1)(A) ...........................................................................18

20 U.S.C. § 1401(9)(D) ...............................................................................18

20 U.S.C. § 1412(a)(5) .................................................................................19

20 U.S.C. § 1414(a)(1)(A)(i)(VI)(bb) .........................................................44

20 U.S.C. § 1415(a) ......................................................................................23

20 U.S.C. § 1415(b)(6)(A) ......................................................................23, 45

20 U.S.C. § 1415(f) ......................................................................................40

20 U.S.C. § 1415(h) .....................................................................................40

20 U.S.C. § 1415(j) ....................................................................................n. 8

20 U.S.C. § 6301 ..........................................................................................44

20 U.S.C. § 6311(b)(2)(D)(i)-(ii) ...............................................................44

20 U.S.C. § 6313(d)(2)(D)(ii) .....................................................................44

O.C.G.A. § 24-8-801 ...................................................................................36

O.C.G.A. § 24-8-802 ...................................................................................36

## Regulations

34 C.F.R. § 200.6(a) ....................................................................................44

34 C.F.R. § 300.114(a)(2) ......................................................................19, 20

34 C.F.R. § 300.115 .....................................................................................21

34 C.F.R. § 300.115(b)(2) ...........................................................................21

34 C.F.R. § 300.116 (a) ...........................................................19

34 C.F.R. § 300.116(a)(2) ....................................................19, 25

34 C.F.R. § 300.116 (b) ........................................................19, 25

34 C.F.R. § 300.116(d) ..........................................................19, 26

34 C.F.R. § 300.116(e) ..............................................................35

34 C.F.R. § 300.160(c)(1) ..........................................................44

34 C.F.R. § 300.305(a)(1) ..........................................................28

34 C.F.R. § 300.305(c) ............................................................n. 11

34 C.F.R. § 300.306(a) .......................................................n. 11, 28

34 C.F.R. § 300.320...................................................................18

34 C.F.R. § 300.321(a)(1) ...........................................................18

34 C.F.R. § 300.320(a)(4) ................................................23, 31, 35

34 C.F.R. § 300.320(a)(4) ...........................................................44

34 C.F.R. § 300.320(a)(6)(ii) ...................................................44,48

34 C.F.R. § 300.324 ..................................................................18

34 C.F.R. § 300.507(a)(1) ...........................................................23

34 C.F.R. § 300.8(c)(6) ..............................................................48

## **Rules**

Fed. R. Evid. § 801 ...................................................................45

Ga. Comp. R. & Reg. § 160-1-3-1-.07(1)(h)..............................49, n. 32

Ga. Comp. R. & Reg. § 160-1-3-.07(3)(a)(1),(3)-(6) ............................................49

Ga. Comp. R. & Reg. § 160-3-1-.07(1)(i) ..........................................................n. 31

Ga. Comp. R. & Regs. §160-4-7-.05 App'x (e) ............................................48, n. 4

Ga. Comp. R. & Regs. §160-4-7-.07(2)(a)-(b) .......................................................20

Ga. Comp. R. & Reg. § 160-4-7-.09(5) ..........................................................n. 28

Ga. Comp. R. & Regs. § 160-4-7-.12(3)(l) .................................................40, n. 28

## **Treatises**

Milich, "Georgia Rules of Evidence," 2017-2018 Edition (Thomas Reuters 2017), § 16.4

# JURISDICTIONAL STATEMENT

The District Court has subject-matter jurisdiction of the case pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (civil rights jurisdiction) because this case arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. 1400 *et seq*. This Court has jurisdiction of the appeal pursuant to 28 U.S.C. § 1292(a)(1) because Appellants appeal the District Court's order denying Appellants' Motion for Final Judgment. The District Court's order denying Appellants' Motion for Final Judgment was issued on March 29, 2024, and Appellants timely filed a notice of appeal on April 29, 2024.

## STATEMENT OF THE ISSUES

I.      Whether the Court applied the incorrect legal standards and analysis when determining whether the educational placement required by the school complied with IDEA?

II.      Whether the Court erred in determining that there was no claim for relief addressing the child's placement and least restrictive environment (LRE), and if allowed, the placement violated IDEA's least restrictive environment (LRE) protections?

III.     Whether the Court's ruling violated IDEA's right of confrontation and cross-examination on the substantive merits of a free appropriate public education (FAPE) by exclusively relying on inadmissible hearsay evidence?

IV.     Whether the finding of mootness by the court with respect to the testing and alternative test issues is clear error by the District Court?

## STATEMENT OF THE CASE

### I. Statement of the Facts

#### A. General Overview

Plaintiff Caleb B. ("C.B.") is a 16-year-old student[1] with Down Syndrome ("DS") who is eligible under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1400 *et seq*, as a student with a disability. Doc. 18-13 at 2544, ¶ 1; Doc. 6 at 4, ¶ 2.[2, 3] C.B. is eligible as a student with Mild Intellectual Disability ("MID"),[4] Speech/Language Impairment, and Other Health Impairment ("OHI"). Doc. 18-13 at 2544, ¶ 1; Doc. 6 at 11, ¶ 25. Plaintiff's mother and father

---

[1] C.B. was 11 years old when the case began. Doc. 18-1 at 11, ¶ 1.

[2] The administrative record is identified in the Docket as Document 18 ("Doc. 18") and includes Document 18 through Document 18-13. The Due Process Hearing Request is Doc. 18-1, at 6-52.

[3] The Final Decision of the Administrative Law Judge ("ALJ") is in the administrative record at Doc 18-13, at 2543-86. The transcripts of the Administrative Hearing are Nov. 15, 2019, Doc. 18-13 at 36-432; Nov. 18, 2019, Doc. 18-13 at 731-997; Nov. 19, 2019, Doc. 18-13 at 1027-1352; Nov. 21, 2019, Doc. 18-13 at 1625-1931; and Nov. 22, 2019, Doc. 18-13 at 2177-2326. Pursuant to Eleventh Circuit Rule 28-5, references to the record cite to document number and page number as identified by the header generated by the district court's electronic filing system. Citations will use abbreviated names of any document not readily identifiable to the Court.

[4] ID classification maintains mild, moderate, severe or profound intellectual disability. Ga. Comp. R. & Regs. §160-4-7-.05 App'x (e). Mild intellectual disability ("MID") is defined as "[i]ntellectual functioning ranging between an upper limit of approximately 70 to a lower limit of approximately 55; and . . . [d]eficits in adaptive behavior." Id.; Doc. 18-13 at 1917:9-1918:1.

are K.B. and S.B. Doc. 6 at 7-8, ¶¶ 13, 18.  C.B. was in 4th grade at East Lake

Elementary School in the Henry County School District ("HCSD" or "District") in

the 2018-19 school year. Doc. 18-13 at 2544-45, ¶¶ 2, 3; Doc. 6 at 7, ¶ 13. He now

is in high school but has maintained his Resource placement.[5]

     C.B. has learned throughout and can progress in any environment with

appropriate supports, accommodations, and modifications. Doc. 6 at 11, ¶ 26. At

the time of the hearing, C.B. could read fluently but had difficulty with reading

comprehension. Doc. 18-13 at 300:18-24, 351:3-15, 1301:24-1302:4. He has

functional math skills, Doc. 18-5 at 223, and fine motor deficits, that made writing

hard. Doc. 18-13 at 308:20-24, 380:15-23. C.B. could use his recall but struggled

with staying on task. Id., 309:3-13, 873:1-20.

### B.    C.B.'s Placement and Progress in the 2018-2019 School Year

     In 2018-19, C.B. was in a general education class with a paraprofessional for

Science and Social Studies and in a small group Interrelated Resource ("IRR" or

"Resource") class on the general education curriculum for English ("ELA") and

Math. Doc. 18-13 at 2544-45, ¶ 3. In October 2018, his Individualized Education

Program ("IEP") identified that he was making progress. Doc. 6 at 13, ¶ 30; Doc.

18-6 at 40-41. The goals were below grade level to enable his placement in

---

[5] The hearing record reviews through the mid-5th grade.

mainstream and Resource, Doc. 18-13 at 2559, ¶ 43; Doc. 6 at 13, ¶ 31; Doc. 18-13 at 871:22-872:10, with "access" to the general education standards, and he consistently learned. Doc. 6 at 13, ¶ 32; Doc. 18-13 at 1321:8-1322:19, 1683:12-1686:16; <u>see</u> e.g., Doc. 18-7 at 109-10. In general education classes, C.B. participates. Doc. 18-13 at 1321:8-1322:19, 1683:12-1686:16. He had friends, worked hard and was (and still is) well liked. <u>Id.</u>, at 314:8-13, 1309:3-11, 1315:10-15, 1320:21-1321:22, 1824:16-1825:12. C.B. was and remains active in his community in church and baseball, where he was and is fully integrated. <u>Id.</u>, 313:7-314:13.

## C. May 14, 2019 IEP Meeting, the Change in Placement, and GAA

At the IEP meeting on May 14, 2019, which finished the IEP placement, progress reports showed C.B. progressed on and/or mastered all goals and objectives in his IEP. Doc. 18-13, at 2551, ¶ 23; Doc. 18-7 at 130-31.

Despite his progress, HCSD pushed to remove C.B. from the general education assessment to the Georgia Alternate Assessment ("GAA") without describing how the GAA would be administered or what it would mean. Doc. 18-13 at 2555-56, ¶¶ 34-35; Doc. 18-7 at 25-39, Doc. 18-13 at 395:21-396:10.[6] The

---

[6] The GAA was a folder of work sent for review to the DOE, but it had changed and no one could explain it. Doc. 18-13 at 395:21-396:10, 1869:24-1870:17.

Family objected and argued the GAA is for students more significantly impaired than C.B. and does not assess academic progress. Doc. 18-13 at 393:15-394:16, 978:6-982:19, 1916:9-1917:1.

The IEP added new accommodations, supplemental aids and services, and supports. Id., at 101:5-18, 808:11-818:25, 2238:14-2243:25; Doc. 6 at 8, ¶ 17; id., at 17, ¶ 46.[7] There was no discussion that these could not be implemented in Resource. Id.; Doc. 18-6 at 286-91 and Doc. 18-7 at 1-21. Class testing accommodations were added, Doc. 18-13 at 2554, ¶ 32; Doc. 18-13 at 819:14-23, and there was no discussion that these prevented using the general assessments. Doc. 18-7 at 14-24. The Family sought instructional modifications, but HCSD insisted such modifications were not allowed in Resource and required a self-contained placement. Doc. 18-13 at 304:5-307:23, 326:8-13, 374:6-375:9, 915:22-916:19, 1693:2-18. The Parents asked to implement the new supports in Resource, but HCSD refused to allow use of any new accommodations before requiring C.B.'s removal to a self-contained class for students with mild intellectual disability ("MIDSC" or "Self-Contained") for English/Language Arts and Math. Id., at 154:19-156:21, 395:2-5; Doc. 18-7 at 41-52; Doc. 18-13, at 2556-57, ¶¶ 36-37. HCSD's IEP provides 135 minutes five (5) times per week in Self-Contained.

---

[7] New accommodations included a calculator, previewing, a visual schedule and checklist, study guides, and notetaking assistance. Doc 18-13 at 2554-55, ¶¶ 31, 33; id., at 808:11-818:25, 859:3-860:24, 970:3-972:19.

Doc. 18-5 at 297.

At the IEP meeting, HCSD presented Self-Contained as the more restrictive placement than Resource. HCSD administrator, Mr. Christopher said:

> All right so I guess what we're thinking what we're needing to decide as a team is is resource is the resource setting, and you have every right to your professional opinion. OK? Is resource the best setting for Caleb or does he need a more restrictive setting, possibly that offers the unique curriculum? I guess that's what we're tasked with deciding.

Doc. 18-7 at 65.

The small group Resource class for ELA and Math included students with varying exceptionalities. Instruction was on the general education curriculum, and students took the general education standardized assessments. Doc. 18-13 at 2273-74, 2291-93. In contrast, Self-Contained included 9-10 students in 3rd through 5th grades. The curriculum was modified, and all students had intellectual disabilities and were placed on the GAA. Id., at 364, 2273, 2293-94, 2312. C.B.'s mother, K.B., observed the Self-Contained class and found that instruction was not differentiated and there were no visuals or other instruction, accommodations or supports that would enhance C.B.'s learning. Id., at 364-66. MID students have been observed eating separately from the general education students and did not participate in field day or have field day t-shirts, unlike the other students. Id., at 2319-20; see also id., at 2276-77.

HCSD explained that C.B. required Self-Contained because he had not

mastered grade level standards and it would be "best" or "most appropriate" for him. Doc. 18-7 at 59-67; Doc. 6 at 8, ¶ 17; Doc 18-13 at 116:22-117:24, 149:1-153:24, 1753:11-1754:23, 1803:1-13, 1921:16-1923:24; Doc. 18-2 at 25. HCSD did not identify any benefits of Self-Contained beyond their explanation that, in their opinion, it was "best." HCSD did not address C.B.'s lack of need for an adaptive curriculum or the potential for harm in this restrictive placement. Doc. 18-7 at 41-83; Doc. 18-13 at 398:2-399:19, 2246:17-19. HCSD foreclosed discussion about C.B.'s need for peer socialization and peer models. Doc. 18-7 at 49. No Self-Contained teacher participated in the IEP meeting, Doc. 18-13 at 2229:2-2232:10, HCSD did not identify that C.B. would learn more, id., at 401:14-403:6, 821:2-20, 2322:3-23, or explain the required CBI, i.e., field trips taking the student away from classroom instruction. See Doc. 18-13 at 401:14-403:6, 821:2-20, 1924:7-1929:16; Doc. 18-7 at 60-61. HCSD did not identify how C.B. could avoid falling further behind. Doc. 18-13 at 401:21-24, 832:23-833:3.

C.B.'s exposure to grade level standards in Resource was more rigorous as the adaptive curriculum teaches fewer of the standards. Id., at 311:23-312:6, 974:17-975:24, 2271:1-25. The Self-Contained curriculum requires students to work on Life Skills, appropriate for children needing instruction such as in shopping. Id., at 1868:14-1871:15; Doc. 6 at 19, ¶ 57. CBI is for a functional skills class with Moderate to Severe intellectual disabilities, Doc. 18-13 at 1927:1-

1928:9, children with more significant impairments than C.B. Doc. 18-5 at 278-303.

The Family wanted C.B. to continue to access the general education curriculum, seeing it as harmful for him to learn less and at slower pace, with less rigor. Doc. 18-13 at 2321:19-2322:2. He will be better prepared for the real world if the school expectations for him are not lowered. Id., at 399:7-401:13.

### D.   Due Process Hearing Request and Denial of Stay Put Rights

The Family's hearing request filed on July 30, 2019, challenged C.B.'s evaluations, program and placement, and the decision to remove him to the GAA. Doc. 18-1 at 6-52. When C.B. arrived on the first day of the 2019-20 school year, he was directed to the contested Self-Contained class. Doc. 18-13, at 2558, ¶¶ 40-41; Doc. 18-13 at 413:1-416:11; see also id., 2251:15-16 (C.B. "was going to the MID room."). He challenged this on stay-put[8], Doc. 18-1 at 84-88, and the ALJ returned C.B. to Resource, his prior IEP's placement. Doc. 18-1 at 144-45. Plaintiffs amended their Hearing Request to include additional claims. Doc. 18-2 at ¶ 106-25. See Doc. 18-1 at 144-45; Doc. 18-13 at 388:4-389:5.

The ALJ granted summary determination for the Family on HCSD's failure to conduct an Occupational Therapy evaluation and the right to an Independent Educational Evaluation for OT, finding OT an area of need. Doc. 18-3 at 1-11.

---

[8] See 20 U.S.C. §1415(j).

## E.    Due Process Hearing

An evidentiary hearing was held on the remaining claims on November 15, 18, 19, 21, 22, 2019. Doc. 18-13 at 2544. The Family presented undisputed expert testimony with information about LRE procedure, C.B.'s educational needs, the appropriateness of the resource program as well as the harms created by an overly restrictive Self-Contained placement. For example, LRE and instructional expert Dr. Holly Ward, Ph.D., who also assessed C.B., explained that placement decisions begin by considering the services and supports needed to be successful in general education, accommodations and modifications, if appropriate, and implemented wherever C.B. is found. Doc. 18-13 at 922:23-924:21, 951:3-10. This testimony was unrebutted. Dr. Ward further testified that a self-contained classroom was not appropriate as C.B. needs to learn in the world he will live, "to prepare him for life….There is no special-ed world." Id., at 974:20-975:11. With regard to alternative testing, Dr. Ward testified that only students with the "most" severe intellectual disabilities qualify for GAA, and C.B. did not fit the standard. Id., at 977:9-982:19. HCSD did not rebut this testimony.

Experts and evaluators Babcock, Murphy and Wing echoed these sentiments and opined that Resource was appropriate, both educationally and socially, and that C.B. can be successful in the educational environment with appropriate accommodations and curriculum modifications. Doc. 18-13 at 195:4-197:7, 249:7-

250:19, 271:20-272:5; 191:12-23, 209:1-210:7 (Babcock); id., at 1168:9-1171:16,

1176:13-1177:21, 1204:4-1210:4, 1243:20-24, 1242:9-22 (Murphy); id., at 1099:1-

1100:16 (Wing).  These experts testified resoundingly that C.B.'s educational

program, expressly including his IEP goals, could be implemented in Resource.

HCSD's case consisted of teachers whose testimony described educational

placements not even at issue in the hearing.  See id., at 1299:18-20, 1633:3-7,

1670:3-24, 1712:3-6. This evidence was of classes the IEP team had determined

were inappropriate and had changed to co-taught classes with additional

accommodations not yet implemented. Id., at 946:15-947:14; P5, Doc. 18-7 at 41-

52.  HCSD failed to present live testimony from any teacher to support the Self-

Contained placement.

### F.     The ALJ's Final Order and the Family's Petition for Review

The ALJ's Final Decision was January 27, 2020. Doc. 18-13 at 2543-89.

The ALJ found that HCSD denied FAPE, and ordered extensive OT compensatory

and prospective services, and compensatory services for the denial of stay-put.

Doc. 18-13 at 2582-83, ¶¶ 32-35. However, the ALJ *sua sponte* addressed an issue

untouched by the parties and held that the Family had no LRE claim. Id. The ALJ

believed that the Self-Contained class was not more restrictive than Resource

because both classes were without non-disabled students. Id., at 2577-80, ¶¶ 23-27.

The ALJ did not consider whether the Self-Contained placement was required

based on C.B.'s IEP and individualized needs.  Id., at 2577-80, ¶¶ 23-28. The

Order found that HCSD's FBA was inadequate but did not assess the impact on

C.B.'s placement decision.  Id., at 2580-81, ¶ 29. The ALJ ignored HCSD's denial

of FAPE and the impact of that failure on C.B.'s placement.

Similarly, the ALJ failed to address that HCSD evaluated C.B.'s placement

using inappropriate criteria to justify the more restrictive placement, including:

> Relying on C.B.'s need for special education;
>
> Requiring mastery of state grade level standards rather than access to the standards for inclusion/mainstreaming; and
>
> Removing C.B. from Resource because of a need for modifications.

Doc. 18-13, at 2577-2580, ¶ 23-28.

The ALJ relied heavily on hearsay statements in C.B.'s meeting transcript

for their truth, see id., at 2551-56, ¶¶ 23-24, 28, 35-36[9], and on testimony of

science and social studies teachers from general education classes that were not at

issue and had been materially changed. See Doc. 18-13 at 2552-61, ¶¶ 25, 35-36,

45; id., at 2557, ¶ 38; id., at 2552, ¶ 26.

Finally, the ALJ allowed C.B.'s removal from mainstream testing by

interpreting GAA's requirement of "significant cognitive disability" to equate with

---

[9] The ALJ, in the findings, recites statements of teachers at the meeting, perhaps a non-hearsay use, but then, in the conclusions of law, the ALJ relies on these statements for the truth of the matters asserted.  See Doc 18-13 at 2551-56, ¶¶ 23-24, 28, 35-36; cf. id., at 2575, ¶ 16; id., at 2580, ¶ 28.

IDEA's definition of anyone with an intellectual disability, expanding the criteria beyond its meaning to include C.B. Doc. 18-13, at 2574-75, ¶ 18.

## II.    Course of Proceedings and the District Court's Order

On April 24, 2020, the Family filed its Complaint in the district court. Doc. 1. On June 26, 2020, HCSD Answered. Doc. 6. The Family filed a Motion for Judgment on the Record on March 17, 2021. Doc. 29; 29-1; Doc. 29-2; see HCSD's Docs. 39-41; and Docs. 44-46 (Reply). Following the parties' submission of additional evidence allowed by the district court, the Family refiled their motion for final judgment. Doc. 61, 61-1, and 61-2. HCSD opposed the motion. Doc. 62, 62-1, 62-2.  See also Doc. 63, 63-1, 63-2 (Reply). On January 16, 2024, the Family filed a notice identifying a change in GDOE regulatory authority relating to their GAA claim.  Docs 64, 64-1.

On March 29, 2024, the district court issued an Order affirming the final decision of the ALJ but holding the GAA claim moot. Doc. 66; Doc. 67. Like the ALJ, the district court ruled no LRE claim existed because both the Resource and Self-Contained placements were special education classes consisting only of disabled students. Doc. 66 at 24. The court failed to review the placements and did not assess the substance of either environment, their relation to FAPE or the IEP, or what would occur in those settings. Doc. 61 at 22-30; id., at 27. The district court alternatively found that HCSD "satisfied its LRE obligations," Doc. 66 at 30,

and like the ALJ, allowed C.B.'s removal from Resource because he is disabled and has "significantly deficient scores" and "his goals were not set at the fourth-grade level." Doc. 66 at 29.

Like the ALJ, the district court's decision substantially relied on hearsay statements from the IEP meeting transcript for their truth. <u>See</u> Doc. 66 at 7-8. The district court also stated that teachers were modifying the curriculum for C.B. (challenged on FAPE and LRE), Doc. 77 at 31, despite a void of IEP approved modifications. Doc. 18-13 at 918-19; <u>see also</u> <u>id.</u>, at 128-34. Many failings of FAPE which impacted placement were unreviewed, and the GAA issue was found moot even though the parties presented no such arguments. <u>Id.</u>, at 30-31,

On April 21, 2024, the Family filed a Notice of Appeal in the district court. Doc. 70. On May 29, 2024, the Family filed their Notice of Appeal in this Court. 11th Cir. Doc. 1.[10]

## III. Standard of Review

Several standards govern this Court's review of IDEA cases. Whether an educational program provided an adequate education under the Act is a mixed question of law and fact subject to de novo review. <u>C.P. v. Leon County Sch. Bd. Fla.</u>, 483 F.3d 1151, 1155 (11th Cir. 2007) (citing <u>Sch. Bd. v. K.C.</u>, 285 F.3d 977,

---

[10] To avoid confusion, Appellants refer to the documents filed in this Court as "11th Cir. Doc - #" to distinguish from the documents filed in the district court, which are identified by their document number as "Doc-#."

982-83 (11th Cir. 2002)); <u>Draper v. Atlanta Indep. Sch. Sys</u>., 518 F.3d 1275, 1284 (11th Cir. 2008). Specific findings of fact are reviewed for clear error. <u>R.L. v. Miami-Dade Cnty. Sch. Bd.</u>, 757 F.3d 1173, 1181 (11th Cir. 2014). Questions of law including the interpretation of governing statutes and regulations are reviewed de novo. <u>R.L.</u>, 757 F.3d at 1181.

# SUMMARY OF THE ARGUMENT

This appeal presents core IDEA issues where FAPE, LRE (placement) and the hearing rights of children intersect. C.B. appeals the ALJ's and district court's failure to engage with the substantive issues the Family pled arising from HCSD's insistence that C.B. move to a Self-Contained program. Despite a five-day trial where the Family presented evidence on C.B., his educational needs, his progress and the appropriateness of the Resource setting, the ALJ ordered that they had no right to dispute this wholesale change in C.B.'s IEP/placement because no claim under IDEA's least restrictive environment (LRE) rule existed when both settings contain only students with disabilities. The ALJ avoided true consideration of the appropriateness of HCSD's proposed placement, a predicate to considering LRE, or the LRE standards themselves. Simply put, the ALJ punted on her obligations to decide the case by deploying an overly formulaic application of the LRE rule.

This head counting approach avoided examining "the child's overall education experience, balancing the benefits" of the placements. Daniel R.R. v. State Bd. of Ed., 874 F.2d 1036, 1049 (5th Cir. 1989). Or whether Resource (a supplemental service) "would permit satisfactory education," including its considerable nonacademic benefits. Greer v. Rome City Sch. Dist., 950 F.2d 688, 697 (11th Cir. 1991), citing Daniel R.R. at 1049. In doing so, determinative considerations about both environments and the IEP were left unassessed. Like the

14

ALJ, the district court ignored the heart of the Family's case, finding that no LRE claim existed. The district court bolstered its decision by improperly relying on hearsay evidence and finding that the older IEP team decision regarding the C.B.'s method of educational assessment was moot.

The Family in this appeal argues that IDEA's FAPE guarantee and its promise of LRE mean more than simply counting of non-disabled students in the classroom. LRE, the mandate of inclusion/mainstreaming codified into the special education law, applies equally across the continuum of alternative placements, requiring FAPE before a court can endorse the appropriateness of the placement. LRE and FAPE combine to ensure that a child being moved from one restrictive classroom to another has the right to dispute that change, and that required LRE criteria are not forfeited simply because non-disabled students are not present, especially when there are significant differences in the classes and instruction that is allowed.

The impact of the ALJ's and district court's application of the LRE rule was to eliminate the opportunity for the Family to dispute the move with evidence of both the existing placement's appropriateness and the ills and limitations that accompanied the overly restrictive proposed placement. The Family sought the district court's considered review of a clearly erroneous administrative decision. The district court, however, committed the same error as the ALJ –avoiding the

issue through a narrow application of the LRE rule as well a clearly erroneous determination that an issue disputed by the Family and addressed each and every subsequent IEP meeting was moot. This result left C.B., a child that was learning even with services held to be inappropriate, without a claim to contest removal from general education with Resource support.

The Family appeals the district court's affirmance of the ALJ's holdings and identifies clear error in both the use of hearsay by the district court and the district court's holding that claims related to the GAA are moot. The Family seeks a reversal of the district court and believes the record may be sufficient for this Court to find that HCSD denied C.B. his guaranteed right to FAPE in the LRE.

## ARGUMENT AND CITATION OF AUTHORITY

## I.  Introduction

C.B. appeals the failures of the ALJ and district court to properly review the violation of LRE and its relationship to the denial of FAPE, core IDEA rights of children.  C.B. raises three challenges to the district court's order, including the failure 1) to address the Family's LRE claims; 2) to rectify the ALJ's flawed administration and review of the Family's claims during the administrative due process hearing; and 3) to address the impact of the GAA issue by deeming it moot.  C.B. first sets out the legal foundations of his right to free, appropriate public education (FAPE) and the provision of such a FAPE in the least restrictive environment (LRE) and then details for this Court the basis for each error by the district court.

C.B. is disabled with DS and a mild cognitive impairment. He confronted a demanded removal from a mainstream placement with supplemental services in Resource, despite that he was progressing on his IEP goals, accessing, and learning on the general educational curriculum, and had new accommodations. FAPE in the LRE is a factual individualized inquiry assessing the classes, or here, placements at issue, <u>see</u>, <u>Greer</u>, 950 F.2d at 696-698, but was not the basis of the decisions as both failed to "abide by the standards set forth" in the Act, which demanded a different result. <u>Id.</u>, at 699.

**II.    C.B.'s Right to a FAPE in the LRE**

        **A.    FAPE**

IDEA requires a Free Appropriate Public Education ("FAPE") for children with disabilities who, because of their impairments, need special education and related services. <u>See</u> 20 U.S.C. §1400(d)(1)(A)(2012); <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley</u>, 458 U.S. 176, 203 (1982); <u>Endrew F. v. Douglas Cnty. Sch. Dist</u>, 580 U.S. 386, 402 (2017). FAPE is accomplished through implementation of an IEP tailored to meet the needs of the child. 20 U.S.C. § 1401(9)(D); <u>Loren F. v. Atlanta Indep. Sch. Sys.</u>, 349 F.3d 1309, 1312-13 (11th Cir. 2003); 34 C.F.R. § 300.320 (2006). The IEP is written by the IEP team, which includes the Parents. 34 C.F.R. §§ 300.321(a)(1), 300.324 (2006).[11] The student's "educational program must be appropriately ambitious in light of his circumstances." <u>Endrew F.</u>, 580 U.S. at 402. To determine whether a student has been denied FAPE, courts ask:

> First, has the state complied with the procedures set forth in the Act? And second, is the individual education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

<u>Rowley</u>, 458 U.S. at 206-07. Here, the ALJ found C.B. was denied FAPE. Doc. 18-13 at 2582-83.

---

[11] The parent is a member of any team that makes educational decisions about the child. 34 C.F.R. § 300.305(c)(2006); <u>see also</u> <u>id.</u>, §§ 300.306(a), 300.305(a)(1)(2006).

After the IEP team designs an IEP that provides FAPE to the child, the child must be provided an appropriate educational placement. Placement decisions must be "made in conformity with . . . [34 C.F.R.] §§ 300.114 through 300.118 . . . ." 34 C.F.R. § 300.116(a)(2). They must be based on the needs of the child, i.e., "based on the child's IEP," 34 C.F.R. § 300.116(b), and consider "any potential harmful effect on the child or on the quality of services that she or she needs . . . ." 34 C.F.R. § 300.116(d).

**B.     LRE**

The Least Restrictive Environment ("LRE") requirement is the pillar of an appropriate placement. IDEA provides:

> To the maximum extent appropriate, children with disabilities are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(2004); see also 34 C.F.R. § 300.114(a)(2)(same). Thus, "…Congress created a statutory preference for educating handicapped children with nonhandicapped children." Greer, 950 F.2d at 695. The student must be placed in the LRE appropriate to his individual needs. Id., at 692.

The Eleventh Circuit, after addressing FAPE in Greer, adopted a two-part LRE test. Id., at 697 (citing Daniel R.R. at 1045). The Court first asks whether the

district took steps during the IEP process to accommodate the student in the less restrictive classroom:

> [B]efore the school district may conclude that a handicapped child should be educated outside the regular classroom, it must consider whether supplemental aids and services would permit satisfactory education in the regular classroom. The school district must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction, for which it is obligated under the Act and the regulations . . .

Greer, 950 F.2d at 696. See 34 C.F.R. § 300.114(a)(2); Ga. Comp. R. & Regs. §160-4-7-.07(2)(a)-(b). If the first prong is met, that ends the inquiry. Greer, 950 F.2d at 698. If not, the inquiry moves to "whether the school has mainstreamed the child to the maximum extent appropriate." Id., at 696 (citing Daniel R.R., 874 F.2d at 1045).[12]

The heart of the LRE test is where on the placement continuum the IEP can be implemented, with the needed supports, services, and modifications, starting with the most inclusive. Id., at 692; Doc. 18-13 at 922-23. The question is whether the student with appropriate supports can make progress in the less restrictive environment and access the standards and not whether he masters all IEP goals and objectives or achieves all grade level standards. See L.H. v. Hamilton Cnty Dept. of Educ., 900 F.3d 779, 792-93 (6th Cir. 2018); A.B. v. Clear Creek Ind. Dist., 787 F. App'x 217 (5th Cir. 2019) (progress prevents more restrictive placement).

---

[12] This same inquiry is asked of each progressively more restrictive placement.

To provide for the LRE, the school district must provide a "continuum of alternative placements," 34 C.F.R. § 300.115 (2006), including "provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement." 34 C.F.R. § 300.115(b)(2). See Greer, 950 F.2d at 696 ("The school district must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction, for which it is obligated under the Act…").[13]

### C.    How FAPE and LRE Intersect

FAPE drives LRE. "[T]he presumption in favor of mainstreaming is overcome" by the duty to provide FAPE to the child. Greer, 950 F.2d at 695; see also T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 162 (2d Cir. 2014)(same). S.H. v. State Operated Sch. Dist. of the Cty of Newark, 336 F.3d 260, 272 (3d Cir. 2003)(School must first prove appropriateness and "cannot bootstrap the meaningful educational benefit with the LRE requirement.")[14] See e.g., Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd.

---

[13] The Family challenged removal from Resource ("IRR") for English/Language Arts (ELA) and Math, which is a supplemental service.

[14] See also R.S. v. Montgomery Tp. Bd. of Educ., Civ. Act. No. 10-5265, 2012 WL 2119148 at *4 (D.N.J. 2012)(explaining that Third Circuit recognizes "inherent tension in the Act between the preference for mainstreaming . . . and the requirement of [IEPs]," and found that "[u]ltimately, the 'IDEA requires that disabled students be educated in the least restrictive *appropriate* educational environment.'")(emp. in original).

of Educ., 41 F.3d 1162, 1168 (7th Cir. 1994) (IDEA's mainstreaming requirement "is applicable only if the IEP meets IDEA minimums.").

For LRE, only placements that are appropriate for the child should be considered. T.M., 752 F.3d at 161. See e.g., Kruelle v. New Castle Cnty. Sch. Dist., 642 F.2d, 687, 695 (3d Cir. 1981)("Only when alternatives exist must the court reach the issue of which is the least restrictive. . . . If day school cannot provide an appropriate education it is, by definition, not a possible alternative.")(int. cit. omitted). Here, as discussed below, the Self-Contained placement could not have been the LRE for C.B. because there was no evidence it was appropriate.

## III.   The Failure to Evaluate C.B.'s LRE Claim is Error by both the ALJ and the District Court

Both the ALJ and the district court punted in the face of a hearing record filled with relevant, highly technical, and unrebutted evidence regarding C.B.'s educational needs.  Neither the ALJ nor the district court engaged with the evidence to determine whether C.B.'s school day should consist of ambitious goals and challenging instruction as sought by the Family.  Instead, both the trial court and the judicial review applied the LRE rule in a narrow, overly simplistic fashion to avoid determining the appropriateness of C.B.'s placement.  By side-stepping the question, the ALJ and district court carved the LRE rule down to a simple counting of heads without consideration of important elements of placement,

including C.B.'s needs as well as his performance at the time of the dispute's origin. Both courts missed the mark and subjected C.B. to an unneeded alternative curriculum provided in a setting for students that required much more support than C.B.

## A. The ALJ Denied the Parents' IDEA Right to Challenge the Placement and Misunderstood LRE

The Family had the right to challenge HCSD's proposed Self-Contained placement for C.B. in a due process hearing where, after presentation of testimony and evidence, an independent official and then judge, would resolve the claim. This right was denied.

IDEA guarantees parents procedural safeguards "with respect to the provision of FAPE," 20 U.S.C. § 1415(a), including "[a]n opportunity . . . to present a complaint -- (A) with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of [FAPE] to such child." 20 U.S.C. § 1415(b)(6)(A). See also 34 C.F.R. § 300.507(a)(1)(same). The Parents exercised their right by filing a Complaint challenging the Self-Contained placement as inappropriate. Doc. 18-1 at 7, 46-47; See 34 C.F.R. § 300.320(A)(4).[15]

---

[15] In Greer, 950 F.2d at 698, this same construct was challenged and overruled (i.e., a jump from general education over Resource, seen as a supplemental service, into full or partial self-contained).

Yet, the ALJ dismissed the placement claim *sua sponte*, finding that the Resource and Self-Contained classes were both special education classes made up of students with disabilities and equally restrictive within the meaning of LRE, ignoring the position of both parties in the case.  At the IEP meeting, HCSD's Special Education Coordinator, Ms. Christopher, defined the question for the Team: "Is resource the best setting for [C.B.] or does he need a more restrictive setting, possibly that offers the unique curriculum? I guess that's what we're tasked with deciding." Doc. 18-7 at 65; see also id., at 77. That was the understanding of the team throughout the meeting and of the parties throughout litigation. HCSD never argued that C.B.'s LRE claim did not exist.  See Doc. 18-7 at 61-66, 83, 89.

By dismissing the claim, the ALJ failed to address the issue at the heart of the case – whether Self-Contained was appropriate for C.B. and, if so, the LRE. The ALJ's reformulation of the issues was harmful error and disregarded the reality of the classes, why they were used, and their impact on C.B., leaving those IDEA questions unresolved. Courts "do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties." U.S. v. Sineneng-Smith, 590 U.S. 371, 376 (2020)(quoting U.S. v. Samuels, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of rehearing en

banc).[16] The ALJ's dismissal of C.B.'s LRE claim was clear error.

Even assuming the classes were equally restrictive, the move to Self-Contained from Resource required review as it was undisputedly a change in educational placement.  See e.g., Doc. 66 at 8-9 ("[T]he IEP team, with objection from Plaintiffs, decided that C.B.'s placement . . . would change from the IRR classroom to the MID class for Language Arts and Math."); Doc. 18-1 at 144-45 (finding Self-Contained was "the new placement that is contested" and ordering stay put in the prior placement).

Counting the number of special education students in the classrooms, after characterizing them as the same for LRE purposes, is not the sine qua non of placement. IDEA requires the placement decision "is made in conformity with . . . §§300.114 through 300.118." 34 C.F.R. § 300.116(a)(2). This decision is based on more than simple student population numbers and must address the child's individual needs as determined by the IEP, 34 C.F.R. § 300.116(b), and "any potential harmful effect on the child or on the quality of services that he or she

---

[16] See also Sanchez-Llamas v. Oregon, 548 U.S. 331, 357, 126 S. Ct. 2669, 2686 (2006)("What makes a system adversarial . . . is ... the presence of a judge who decides on the basis of facts and arguments pro and con adduced by the parties.")(internal citations omitted); Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983)("[A]ppellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties . . . ."); Spann v. Davis, 312 Ga. 843, 845-59, 866 S.E.2d 371 (Ga. 2021)(error for court to rule *sua sponte* on defense not raised by defendant).

needs." Id.; 34 C.F.R. § 300.116(d). These are core IDEA/IEP considerations. Head counts do not meet this standard and simply allow schools to change placement to any class with the same number or density of children with disabilities, without regard to the student's educational or social needs, the IEP, or the student's level of functional ability. There is no basis for this in the Act.

The ALJ's error prevented assessment of critical issues raised by the Family, including basic elements of FAPE, such as the IEP accommodations, language, modifications, supplemental services, and even placement. "Counting the heads" to pretermit these questions within the Greer/Daniel R.R. analysis is simply error.[17] Special education placement decisions are multi-faceted and not merely based upon the number of non-disabled students in a particular class. This overly simplistic application of the LRE rule would leave parents of a mildly disabled student without recourse to challenge a school's change in placement to an inappropriate severe/profound setting simply because the child had an identical art, lunch and P.E. schedule. The Court's failure to truly evaluate the school's decision does nothing to prevent unnecessary segregation and removal from the

_____

[17] This error is particularly irreparable given that the proposed adaptive curriculum addresses fewer standards than the general education curriculum, see e.g., Doc 62 at 12-13, and thus C.B.'s placement into Self-Contained, with its reduction in instructional vigor and reduced expectations, could cause him to fall further behind grade level standards. Doc 18-13 at 974:20-975:11 (Ward); id., at 251:17-23 (Babcock).

general curriculum of students with disabilities. This is the precise harm the LRE rule, and the Court in <u>Greer</u>, sought to eliminate.

**B.      The District Court Failed to Properly Assess the ALJ's Errors Regarding Placement and LRE**

Like the ALJ, the district court improperly passed on evaluation of the Family's IDEA claims. On review to the district court, the Family challenged the Self-Contained placement claiming, *inter alia*, that the IEP used the wrong legal standard, C.B.'s IEP progress was ignored, "potential for harm" was not assessed, and that the Self-Contained adaptive curriculum was inappropriately restrictive. Doc. 61 at 7-9. <u>See also</u> Doc. 1 at 48-50, ¶¶ 103-11. Rather than resolve these claims, the district court took the same path as the ALJ, finding that since both rooms had the same number of non-disabled students (i.e., none) the Family had no placement claim. Doc. 66 at 24. This is the same error.[18]

**C.      There was No Review of the Self-Contained Class and No Evidence of its Appropriateness for C.B.**

After concluding there was no LRE claim, the district court alternatively endorsed the ALJ's finding that that HCSD "mainstreamed C.B. to the maximum extent appropriate," Doc. 18-13 at 2580, ¶ 28, and "satisfied its LRE obligations," Doc. 66 at 30. <u>See</u> Doc. 61 at 22-30. Yet, neither the ALJ nor the district court

---

[18] The court never reached claims that the placement was based on an inappropriate IEP that denied FAPE, Doc. 1 at 46, ¶ 106 and the placement denied FAPE, <u>id.</u>, at 50, ¶ 111, and other errors of the IEP process. <u>Id.</u>, at 48-50, ¶¶ 103-11.

conducted any assessment of whether Self-Contained was appropriate. Id., at 2577-80, ¶¶ 23-28, Doc. 61 at 28-30. This was error as the IDEA required assessment of the placement. See Greer, 950 F.2d at 697 (e.g., to "compare" the "meaningful benefit" of the available placements).[19]

The district court incorrectly believed that it did not have to assess the placement:

> [A]t the core of Plaintiffs' appeal is a request for this Court to decide a methodology or program selection question, i.e., determine which classroom within the school's special education program is appropriate for C.B. But the Act does not require the Court to make this determination, and such a decision is best left to those with the appropriate educational expertise.

Doc. 66 at 27. This is wrong because only after the court determines that IDEA's requirements of FAPE and placement have been satisfied should details relating to the selection of the classroom and/or methodology be left to the district. See Rowley, 458 U.S. at 208 ("[O]nce a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States.").

Moreover, there was no evidence that Self-Contained was an appropriate placement. No MID Self-Contained teachers testified concerning the class, placement, or need. There was scant testimony about Self-Contained and its

---

[19] Though the district court purported to use the LRE standard in Greer, Doc. 66 at 28-29, it failed to accurately apply Greer, which requires assessment of *both* the current and proposed placements. See Greer 950 F.2d at 697.

curriculum, identifying only that it provides social skills training and CBI, neither of which is appropriate for C.B., and the class consists of intellectually disabled students, which is inappropriate for C.B.[20] Doc. 18-13 at 1866:19-1868:14, 1871:16-24, 1917:9-23, 1924:7-1929:16; 2321:15-2322:23; Doc. 18-7 at 60-61.

HCSD presented no evidence that C.B. would receive any meaningful benefit in Self-Contained or that the placement was based on his IEP. The only description of Self-Contained was from HCSD Assistive Technology (AT) evaluator Ms. Beacham, who had never taught a MID class or observed this particular Self-Contained class and had only met C.B. when she conducted her AT assessment in an isolated conference room. Doc. 18-13 at 1866:19-1871:24, 1917:9-23, 1920:8-1929:16, 1924:7-1929:16, 1971:9-23. She admitted that the "adaptive curriculum" in the MIDSC class is for students more impaired than C.B. and confirmed that such needs were not in C.B.'s IEP. Doc. 18-13 at 1924:7-1929:16.[21]

---

[20] The alternative curriculum requires students to work on Life Skills. Doc. 18-13 at 1868-71, 1927-28. C.B. does not need Life Skills instruction and had no life skills goals in his IEP. Id., at 1704, 1928-29; Doc 18-5 at 278-303.

[21] Regarding the restrictive curriculum, Ms. Beacham told the IEP meeting:

> [Beacham:]… You do have other things added in there that let you work on some applicable life skills because in those classrooms you have your CBI trips, community based instruction where you're going out into the community and practicing those independent skills. So I don't know if that's helpful.

There was nothing tying C.B. to a need for the "adapted curriculum" required in self-contained. No testimony identifying that C.B.'s "ambitious" needs would be addressed effectively or that he would learn better in Self-Contained. Id., at 401:14-403:6, 821:2-20, 2322:3-23. See also Cobb Cnty. Sch. Dist., 119 LRP 37938 at *47 (More restrictive MID placement exposes student to fewer standards and will cause her to fall further behind her peers). Ultimately, the District failed to articulate any plan for C.B. to progress out of Self-Contained despite his parents' express concern that removal from the general education class and curriculum would be permanent. Doc. 18-13 at 401:21-24, 832:23-833:3, 2247:5-8; Doc. 18-5 at 278-303.

1) *The District Court Failed to Consider Evidence that Resource was the Appropriate Placement for C.B.*

The district court, like the ALJ, failed to evaluate clear evidence that C.B. could be educated satisfactorily in Resource for ELA and Math with supplemental aids and services.  As discussed in Section II(B), supra, if C.B., with supports, can make progress on his IEP goals and access the standards in Resource, then that is the appropriate placement and the LRE. See Greer, 950 F.2d at 696; L.H., 900 F.3d

---

Doc. 18-7 at 60-61; Doc. 18-13 at 1924:7-1929:16, 2321:15-2322:23.  The district court erroneously found that "the MID classroom teacher" explained the class to K.B. at the IEP meeting. See Doc 66, at 9. That is incorrect as no MID teacher attended the meeting, and the only description of the class and its curriculum was provided by Ms. Beacham. **

at 792-93.[22]

> 2) *C.B.'s IEP and Past Performance Proved Resource was the*
> *Appropriate Placement*

C.B.'s prior progress on IEP goals in Resource proved his education can be achieved satisfactorily there. C.B.'s goals and supports are designed to allow him access to the standards. 34 C.F.R. §§ 300.320(a)(2) (measurable goals) and (a)(4)("…special education and related services and supplemental aids and services … that will be provided …(i) to advance appropriately toward attaining the annual goals; (ii) To be involved in and make process in the general education curriculum ..."). The IEP team believed C.B.'s goals were appropriate, Doc. 18-13 at 378:22-379:2, 833:20-834:3. HCSD's counsel admitted "goals drive placement." Doc. 18-7 at 38-39. HCSD teachers testified they gave C.B. access to the standards. Doc. 18-13 at 1321:8-1322:19, 1683:12-1683:16, 1712:23-1713:25, 1792:19-1795:12, 1798:12-21. His report cards showed progress, mastery or emerging skills on all. Id., at 118:9-124:3, 344:25-345:10; see Doc. 18-7 at 109-10, 124-29. Neither C.B.'s performance nor his IEP services required a Self-Contained setting. See

---

[22] HCSD made binding admissions *in judicio* that C.B. was progressing on his goals and was accessing the state grade level standards in his IRR class. Doc 6 at 6, ¶ 8, and 15, ¶ 39 (C.B. was progressing on IEP goals in IRR); id., at 13, ¶ 32 ("C.B. was given access to the state grade level standards"). This resolves the inquiry as HCSD's admissions are conclusive and establish Resource is the LRE for C.B. "[A] party is bound by the admissions in his pleadings." Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618, 621 (11th Cir. 1983).

Doc. 18-13 at 920:5-11, 940:2-941:12, 945:17-24, 947:2-14, 966:9-972:22; 973:12-974:2; Doc. 18-5 at 278-303; see also Doc. 18-13 at 817:8-15, 820:5-821:1.

Even with an IEP that denied FAPE, C.B.'s progress in Resource had been consistent.[23] The ALJ found "C.B. made progress on his goals and objectives." Doc. 18-13 at 2556, ¶ 36. The core components of his IEP were available and effective in the Resource setting, obviating any need for moving C.B. based upon progress or access to standards.  Regrettably, none of this evidence was considered by the ALJ or the district court.

### 3) The Non-Academic Benefits of Language and Social Role Modeling Supported C.B.'s Placement in Resource

Non-academic benefits of the Resource placement, including language and role modeling from peers, should have been considered by the ALJ and district court. Cobb Cnty. Sch. Dist., 119 LRP 37938 at *47 (quoting Cobb Cnty. Sch. Dist., 112 LRP 43250 at *22 (Ga. SEA May 25, 2012)). See L.H., 900 F.3d at 779. There was substantial evidence of C.B.'s positive engagement and social benefits of peer modeling in Resource. Doc. 18-7 at 41-83; Doc. 18-13 at 398:2-399:19,

---

[23] HCSD repeatedly reported that C.B. was progressing. See Doc 6, ¶ 30 (October 2018 IEP); Doc 18-6 at 40-41, Doc 6 at ¶¶ 8, 27, 39; Doc. 18-13 at 107:7-115:8, 347:19-351:8, 355:2-357:25 (2018-19 Progress Reports); Doc 18-7 at 130-31, 135-45, Doc. 18-13 at 367:22-368:18, 375:23-388:15 (Progress Monitoring Reports after the May 2019 meeting); Doc 18-10 at 30-33 (Progress Monitoring Reports during the 2019-20 school year prior to the hearing in November 2019).

2246:17-19, 2322:3-23. He participated in group lessons, discussions, and activities, and learned from these. Id., at 1321:8-1322:19, 1683:12-1686:16. He had friends and enjoyed interacting with the class. Id., at 314:8-13, 1309:3-11, 1320:21-1321:22, 1712:23-1713:7; Doc. 18-6 at 96. Dr. Babcock, Dr. Ward, Ms. Wing, and Dr. Murphy all testified that exposure to language models and appropriate behaviors and social interactions is vital to C.B.'s progress. Id., at 195:4-197:7, 210:20-211:25, 218:4-13, 249:7-250:19 (Babcock); 943:18-944:25 (Ward), 1099:1-1100:16 (Wing), 1200:7-1204:2 (Murphy). Unlike Resource, Self-Contained limited students' access to typically developing peer models. Id., at 975:1-976:24. Resource services, which included students with other disabilities, exposed C.B. to higher functioning, less impaired peers. Id., at 1173:4-22. Like the school district, neither the ALJ nor the district court considered any of this.

4) *The District Court's Analysis Should Have Addressed HCSD's Non-Compliant Placement and LRE Process*

A judicial review of the ALJ's LRE analysis should have assessed what happened at the IEP meeting and found the process for C.B. woefully non-compliant with IDEA. See generally, Doc. 18-6 at 77-291, and Doc. 18-7 at 1-92. HCSD members used the wrong standard for LRE/placement, asking what class was subjectively "best" rather than whether C.B. was making process on goals and accessing the standards in IRR. See Cobb Cnty. Sch. Dist., 119 LRP 37938 at *47, quoting Cobb Cnty. Sch. Dist., 112 LRP 43250 at *22 (quoting Greer, 950 F.2d at

697) ("Best" is not the standard). The Family's advocate objected to the incorrect standard, but HCSD's counsel continued, stating "This isn't a court of law." Doc. 18-7 at 63; id., at 59-69.

Though multiple accommodations were added to the IEP, HSCD failed to implement those in the less restrictive Resource as required by IDEA.[24]  There was no discussion of the potential for harm, including what would be lost, in the move to Self-Contained or of the quality of services C.B. needs.  HCSD did not consider the non-academic benefits of Resource to C.B., including access to less disabled peers for social and language modeling.

HCSD incorrectly sought a placement change because the IEP goals were below grade level. IDEA does not require C.B., who has Down Syndrome, to keep pace with non-disabled peers to stay in the LRE.  See Cobb Cnty. Sch. Dist., 119 LRP 37938  at *37, 47; L.H., 900 F.3d at 792-93 (progress, not mastery); Daniel R.R., 874 F.2d at 1046-47 (requiring child keep pace fails Rowley); Girty ex rel. Girty v. Sch. Dist., Valley Grove, 163 F.Supp.2d 527, 535-37 (W.D. Pa. 2001); Mavis v. Sobol, 839 F.Supp. 968, 987-88 (N.D.N.Y. 1994). See also Endrew F., 580 U.S. at 402 ("in light of his circumstances."). Finally, HCSD refused to allow modifications of the curriculum in Resource, though an IEP should include

---

[24] The new accommodations made the IEP better suited for the Resource service, as did the OT later added by order of the ALJ.

modifications to enable progress and secure placement in the LRE. See 34 C.F.R. § 300.320(a)(4); Greer, 950 F.2d at 698. C.B. was removed from Resource because of a need for modifications, which IDEA expressly prohibits. 34 C.F.R. § 300.116(e). In contrast, no one at the IEP meeting said that C.B. should be moved from Resource because of his "effect on other students" or need for teacher attention. Doc 18-7 at 58-66. Yet, the ALJ cited this as a basis supporting removal, Doc. 18-13 at 2580, ¶ 28, contrary to the facts and Greer, 950 F.2d at 697 (needing extra teacher attention does not require removal).

In a case where FAPE was denied, and placement based upon inaccurate or otherwise irrelevant information, neither the ALJ nor the district court addressed these crucial violations of IDEA.[25] Aggravating the outcome, the courts relied upon inadmissible evidence and incorrect legal analysis to undercut C.B.'s claims.

## IV. Reliance on Hearsay Statements of the Resource Teacher at the IEP Meeting Violated the Parent's Rights to Confront Witnesses

The district court incorrectly endorsed the ALJ's reliance on uncross-examined hearsay. At the due process hearing, no Resource teacher testified, yet both the ALJ and district court improperly relied on out-of-court statements of Ms.

---

[25] Plaintiffs **_wasted a school year_** waiting for a comprehensive evaluation. Doc. 6 at ¶ 33 (evaluation requested in October 2018); Doc 18-13 at 2547, ¶ 11 (reports provided in April 2019). Yet, the ALJ incorrectly found this delay did not impact C.B. See id., at 2573, ¶¶ 12-13. The lack of evaluations affected CB's learning. See id., at 2319:4-11. The timeliness of evaluations is a FAPE claim, and the district court failed to reach or resolve this error of the ALJ.

Tanner, the Resource teacher, buried in IEP record about C.B.'s performance in the Resource. Cited by the ALJ and district court as the primary evidence supporting C.B.'s removal from Resource, the use of such inadmissible hearsay violates IDEA's procedural rights for parents.

Out of court statements offered to prove the truth of the matter asserted, other than statements by the declarant while testifying at the hearing, are hearsay. O.C.G.A. § 24-8-801; see also Fed. R. Evid. § 801. Such statements are generally inadmissible, see O.C.G.A. § 24-8-802, and have limited probative value, even if admitted without objection. See Milich, "Georgia Rules of Evidence," 2017-2018 Edition (Thomas Reuters 2017), § 16.4 ("Hearsay evidence generally is considered inferior to live testimony because of the lack of opportunity to cross-examine the hearsay declarant."); see also Anton Internat'l Corp. v. Williams-Russell and Johnson, Inc., 190 Ga. App. 150 (1989)(Hearsay has no probative value)(decided under the prior rules); Woodruff v. Woodruff, 272 Ga. 485, 531 S.E.2d 714 (2000)(same).

The IEP meeting transcript is Petitioners' Exhibit 5 ("P5"). See Doc. 18-6 at 77-291, and Doc. 18-7 at 1-92.[26] The IEP transcript was admitted for permissible, non-hearsay purposes in the hearing. See e.g., Doc. 18-13 at 60. Statements of

---

[26] P5 is a transcription made at the Family's expense from an audio recording made by Ms. K.B. at the May 14, 2019 meeting. See Doc. 18-13 at 66-68; Doc. 18-7 at 92.

school district administrators and staff in the IEP meeting transcript have independent legal significance in an IDEA case, regardless of the truth of the matters asserted. IEP meeting statements are evidence regarding whether the school district has "complied with the procedures set forth in the Act," as required by <u>Rowley</u>, 458 U.S. at 206-07, and enabled parent participation and FAPE. They can be vital in an LRE inquiry, as <u>Greer</u> requires *inter alia* "that school officials should consider the full range of supplemental aids and services that may be provided…and they should share these considerations with the child's parents at the IEP meeting." <u>Greer</u>, 950 F.2d at 696. Similarly, because IEP must be evaluated as proposed to the Family in the IEP process, the meeting transcript is relevant to this inquiry. <u>Knable v. Bexley</u>, 238 F.3d 755, 768-70 (6th Cir. 2001). Further, the teachers who did not testify were identified as witnesses by HCSD. Doc. 18-4 at 36. The transcript established what those witnesses said, admitted, and would have been used to cross-examine their testimony had they testified.

C.B.'s non-hearsay uses of the transcript are for the purposes it was created and admitted at the hearing. The ALJ and district court should have limited their consideration of the transcript to those permissible purposes. <u>See</u> e.g., Doc. 18-13 at 1316-22, 1922-29. <u>U.S. v. Parry</u>, 649 F.2d 292, 295 (5th Cir. 1981) (evidence "admissible for one purpose but not for another" is considered "only for the permissible purpose."); <u>U.S. v. Sallins</u>, 993 F.2d 344, 346 (3d Cir. 1993)("Whether

a disputed fact is hearsay frequently turns on the purpose … offered."); <u>Teague v. State</u>, 252 Ga. 534, 536 (1984).

Alarmingly, the ALJ's factual findings almost exclusively rely on Ms. Tanner's out-of-court statements taken from the IEP Transcript. Doc. 18-6 at 77-29 and Doc. 18-7 at 1-92; Doc. 18-13 at 2543-86; <u>id.</u>, at 2552, ¶ 24 ("Tanner also reported that sometimes she …"); <u>compare, id.</u>, at 2576, ¶ 19 ("His resource teacher explained …"). <u>See also id.</u>, at 2544-60, ¶¶ 23, 24, 28, 35, 36. The ALJ included only one statement relating to hearing testimony of a teacher. This identified that C.B.'s general education teacher Ms. Nies testified about C.B.'s performance in a class that everyone agreed was inappropriate and which is not at issue in this case. Doc 18-13 at 2560.

At trial, Ms. Tanner was an employee of HCSD and identified as a potential witness by HCSD. There was no showing of her unavailability during the hearing. The Family raised HCSD's failure to introduce testimony of any of the teachers with relevant information before the ALJ, Doc. 18-13 at 2481, and raised hearsay errors before the district court, Doc. 61-1, at 25-26, n.15. <u>See</u> Doc. 62 at 13-18, 27. HCSD did not respond to the hearsay issue, waiving its opposition to these errors. <u>See</u> Doc. 62; Doc. 63 at 4-5, 9-10.[27]

---

[27] HCSD cited hearsay statements in its district court brief for judgment as if these were testimony presented at the hearing. Doc. 62 at 13, 17-18.

Unfortunately, the district court failed to assess this misuse of hearsay, and likewise relied on the hearsay statements of Ms. Tanner:

> Particularly relevant to this appeal, Ms. Tanner reported that C.B.'s progress on his goals fluctuated...Ms. Tanner explained…As an example, Ms. Tanner stated that one of the fourth grade writing standards is to write multiple paragraphs or cite multiple source, whereas one of the goals the IEP team wrote for C.B. is to write a sentence using two adjectives. Ms. Tanner stated that even with accommodations, she did not believe that C.B. could access the fifth grade standards….

> Ms. Tanner also reported that sometimes she had to pick C.B. up from his previous class to that him to the IRR room . . .

Doc. 66 at 7-8; see also id., at 30 ("C.B.'s IRR teacher explained that although C.B. made progress on his goals and objectives, his goals were not set at the fourth-grade level."). This is hearsay and not testimony vetted by thorough and sifting cross-examination. It stands alone as the only evidence relied on by the district court regarding C.B.'s performance in the Resource class. See Doc. 66.

The district court also erroneously found these hearsay statements in the transcript admissible under the business records exception to the hearsay rule even though HCSD did not raise this argument. Doc. 66 at 7, n.1. Federal Rule of Evidence 803(6)(A)-(E) provides a five-part exception to the hearsay rule for business records, but the district court's Order does not include any analysis of these criteria and makes several erroneous assumptions. Doc. 66 at 7 n.1.

First, the IEP meeting transcript was not "kept in the course of a regularly

conducted activity of a business, organization, occupation, or calling." Next, making the transcript was not "a regular practice of that activity," as Rule 803(6) requires. Indeed, the IEP meeting was transcribed by the Family from a recording made by the Family. <u>See</u> Doc. 18-13 at 66-68. It is Petitioners' Exhibit 5, and not HCSD's evidence. It is not on HCSD's required document disclosure. Doc. 18-4 at 42-45. No business record foundation was ever made. The Family sought a stipulation for its admission and use for non-hearsay purposes.

Not only are Tanner's out-of-court statements unreliable under the rules of evidence, but its use on the truth of the assertions violates the Family's IDEA procedural rights. The procedural safeguards of IDEA give parents the right to an impartial due process hearing, 20 U.S.C. § 1415(f), in which they shall be accorded:

> **(2)** the right to present evidence and confront, cross-examine**,** and compel the attendance of witnesses…

20 U.S.C. § 1415(h)(emp. added); Ga. Comp. R. & Regs. § 160-4-7-.12(3)(l) (same).[28] <u>See</u> <u>Mills v. Board of Ed. of Dist. of Columbia</u>, 348 F. Supp. 866, 881(D.D.C. 1972)(("12). The parent … shall have the right to have the attendance … of any public employee who may have evidence upon which the proposed

---

[28] This is such an important right it is specifically articulated with the "Parental Rights" Notice required from the district to the parent yearly and when a dispute arises. Ga. Comp. R. & Reg. §§ 160-4-7-.09 (5) and 160-7-.12(3) (l)(2) (confront and cross-examine witnesses)

action may be based and to confront and to cross-examine …"); <u>Shaffer v. Weast</u>, 546 U.S. 49, 54 (2005) (IDEA guarantees parents procedural protections, including presentation and cross examination of witnesses at due process hearings).[29]

Moreover, the ALJ and district court failed to recognize that conduct at IEP meetings, including the discussion of each component of an IEP and the positions taken by IEP meeting participants, carry independent legal significance. What is said and decided at IEP meetings are assessed by a fact finder who may rightfully consider a verbatim record of those discussions without regard for the truth of matters asserted. Ultimately, the appropriateness (and truthfulness) of the conversations will be evaluated by the ALJ after full due process hearing procedures are employed, including sifting cross-examination of the declarants and evidence on the "why" or appropriateness of what was said or done. Reliance on the transcript, without any opportunity for a litigant to cross-examine the declarant, is unsupported and undermines IDEA's dispute resolution procedures.

Here, the ALJ and district court used hearsay beyond the purpose for its admission and directly contrary to these basic EHA/IDEA hearing rights established by Congress and endorsed by the U.S. Supreme Court. The ALJ and

---

[29] In <u>Rowley</u>, 458 U.S. 176, 193-194 (1982), the Court recognizes that <u>Mills</u> was one of the two cases discussed at length on the creation of the EHA and its parent rights, which "suggests that the principles which they establish are the principles which, to a significant extent, guided the drafters of the Act."

district court accepted Ms. Tanner's statements as true though the Parents were not given any opportunity to examine the veracity or basis of those statements or to question Ms. Tanner on her understanding of the IDEA standards she based her statements on. The Family was unable to examine whether Tanner, like the others in the meeting, applied an incorrect placement standard or misunderstood C.B.'s right to accommodations and modifications in IRR. Such unexamined hearsay directly relied upon the district court deprived the family of their core IDEA procedural rights and was clear error.

## V.     The District Court Erred in Finding the Family's GAA Claim is Moot

The district court erred in dismissing C.B.'s challenge to the legal standard used to remove him from standard testing onto the alternative testing regime as moot. Doc. 66 at 30-31. This result arose without notice or the opportunity to brief or present evidence on the continued existence of a controversy, restricting a showing of jurisdictional facts to counter whether "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013).

"Under Article III of the Constitution this Court may only adjudicate actual, ongoing controversies." Honig, 484 U.S. 305, 317 (1988), citing Neb. Press Assn v. Stuart, 427 U.S. 539, 541 (1976); Preiser v. Newkirk, 422 U.S. 395, 401 (1975). A case is moot "when the issues presented are no longer 'live" or the parties lack a

legally cognizable interest in the outcome." <u>Fla. Pub. Int. Research Grp. Citizen Lobby Inc. v. EPA</u>, 386 F.3d 1070, 1086 (11th Cir, 2004). It exists when it "is impossible for a court to grant any effectual relief." <u>Cook v. Bennett</u>, 792 F.3d 1294, 1299 (11th Cir. 2015). Yet there are exceptions to mootness. <u>Honig</u>, 484 U.S. at 319-20. One such exception is, "[w]here the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action." <u>Spencer v. Kemna</u>, 523 U.S. 1, 17 (1998)(internal quotations omitted).

In <u>Honig,</u> the Supreme Court directly confronted the question of IDEA claims from prior school years to hold that it retained "jurisdiction if there is a reasonable likelihood that respondents will again suffer the deprivation of EHA-mandated rights that gave rise to this suit." <u>Id</u>., 484 U.S. at 318. <u>Honig</u> was a case challenging the law on the disciplining of students where the Court reasoned:

> .... Although at present he is not faced with any proposed expulsion … and indeed no longer even resides within the SFUSD, he remains ... entitled to a "free appropriate public education" …. His claims under the EHA, therefore, are not moot if the conduct he originally complained of is "capable of repetition, yet evading review." <u>Murphy v. Hunt, 455 U.S. 478, 482 ... (1982)</u>. Given Smith's continued eligibility ... under the EHA, (note 6 omitted) the nature of his disability, and petitioner's insistence that all local school districts retain residual authority to exclude disabled children, ... we have little difficulty concluding that there is a "reasonable expectation," <u>ibid.</u>, that Smith would once again be subjected to a unilateral "change in placement" for conduct growing out of his disabilities.

<u>Honig,</u> 484 U.S. at 319. "<u>Honig</u> made clear that EHA cases are classic cases for application of the 'capable if repetition, yet evade review' rule." <u>Devries v. Spillane</u>, 853 F.2d 264, 268 (4th Cir. 1988).

> **A.** **The Alterative Testing is Still a Live Controversy that Would Evade Review – from Year to Year**

A core IDEA right of students with disabilities is to remain in standard yearly testing as an adjunct to continued instruction and access to the general curriculum. Such decisions on instruction, testing and placement occur at every IEP meeting and are subject to the IDEA dispute resolution procedures and whether a child must take an alternative test rather than the statewide assessment is an issue embedded within each child's IEP. <u>See</u> 34 C.F.R. §§ 300.160(c)(1) and 300.320(a)(6)(ii)(2006). It is one of the areas where the IDEA and the Elementary and Secondary Education Act ("ESSA"), Pub. L. 114-95, 20 U.S.C. §§ 6301 *et seq*, at § 6311(b)(2)(D)(i)-(ii)(2015), overlap. Thus, the ESSA provides that the IDEA IEP team must determine "when a child with a significant cognitive disability shall participate in an alternative assessment." 20 U.S.C. § 6311(d)(2)(D)(ii), citing to 20 U.S.C. § 1414(a)(1)(A)(i)(VI)(bb)(IDEA). <u>See</u> 34 C.F.R. § 200.6(a)(students take the general assessment or those with the most significant cognitive disabilities may take alternative assessment).

This became a significant issue to the Family in May 2019 as HCSD

attempted to move C.B. to Self-Contained and thereby removing C.B. from the general curriculum and testing. This issue continued for years, as the IEP addressed the decision in the annual IEP. The Family have, as all parents of students with disabilities, the right to challenge that decision from year to year. See 20 U.S.C. § 1415(b)(6)(A); Honig, 484 U.S. at 521. See M.T.V. v. DeKalb County Sch. 446 F.3d 1153,1158 (11th Cir. 2003) (this is "broad" i.e., "any matter ... relating to" placement.)

Mootness has applied to IDEA cases involving prior IEP meeting issues revisited from year to year since 1982. Rowley, 458 U.S. 176 (1982). In Rowley, as the legal questions were tied to an amended IEP, mootness arose, but due to the unique EHA/IDEA process, the Supreme Court endorsed constitutional standing as "[j]udicial review invariably takes more than nine months to complete ... [t]he District Court thus correctly ruled that it retained jurisdiction to grant relief because the alleged deficiencies in the IEP were capable of repetition as to the parties before it yet evading review." Rowley, 458 U.S. at 186 n.9. Honig followed Rowley to allow that challenge to a statutory interpretation of placement. Following Honig, the circuits uniformly applied in IDEA cases the exception on IEP and placement claims when the child was still in school, the implicated issue or related issues continued to arise, and the district had not conceded the claim. First, Daniel R.R., 874 F.2d at 1040-41, applied Honig to retain a placement-LRE

case after the placement had changed as "there is a reasonable expectation that the conduct giving rise to this suit will reoccur every school year, yet evade review during the nine-month academic term." See also Rome Sch. Comm. v. Mrs. B., 247 F.3d 29, 31 (1st Cir. 2001)("Issues arising from past IEPs often circumvent the mootness doctrine); Devries, 853 F.2d at 268; Lee v. Biloxi Sch. Dist., 963 F.2d 837 (5th Cir. 1992); Sacramento City Unif. Sch. Dist. v. Rachael H., 14 F.3d 1398, 1403 (9th Cir. 1994)(LRE placement issue may reoccur as legal positions have not changed).

This Court in K.A. v. Fulton County Sch Dist., on a procedural claim similar to the GAA issue, noted that the review process could often be "ponderous." 741 F.3d. 1195, 1200 (11th Cir 2013). Applying the Honig exceptions because the issue arose from IEP considerations, the Court stated:

> IEP's typically last for only one year, as this one did, and judicial review of a challenged program "invariably takes more than nine months to complete, not to mention the time consumed during the preceding state administrative hearings."[6] The "ponderous" administrative and judicial review process measured against the brevity of a school year to which an IEP applies satisfies the shortness of time requirement for the mootness exception.

Id. The recurrence criteria was "satisfied because there is a reasonable expectation that the school district will seek to amend K.A.'s IEP in the future" and the "same procedural objections" may reoccur. Id. K.A. (a child much like C.B.) had years of schooling left, and there was no reason to think

that the parents' devotion, nor that the district's position, would diminish.

Id., at 1201.

Applying the Honig/K.A. approach, the alternative testing issue arises each year. The GAA issue was a live IEP controversy many times during the litigation. In January 2020, the IEP Team failed to reach any consensus regarding C.B.'s eligibility,[30] so the Family submitted that IEP as additional evidence to support their claims, though neither side considered the controversy resolved. See Doc. 48 (Order admitting IEP documents as evidence).[31]

As in Rowley/Honig/K.A., the legal test is still at issue, the parties disagree over the result from 2019, and it has been addressed from year to year. C.B. has a cognizable interest in resolving the legal standard and the error in the district court's application and he can receive meaningful relief.

**B.    C.B. was Improperly Placed on the GAA**

The issue deemed moot below had been incorrectly decided by the ALJ, requiring reversal.  The evidence established that HCSD placed all Self-Contained

---

[30] Plaintiffs filed the IDEA required motion to admit additional evidence to the administrative record. Doc. 30, 31 and 32. See generally, Bennett v. Walker Cnty Sch. Dist., 203 F.3d 1293 (11th Cir, 2001). This was allowed by Order. Doc. 48.
[31] The Georgia Department of Education later amended part of its regulations at Ga. Comp. R. & Reg. § 160-3-1-.07(1)(i) emphasizing the GAA is for "students with *the most* significant cognitive disabilities." Doc. 64 at 2. C.B. filed this as a notice of subsequent authority, as relevant to showing legal error. Id.  HCSD's response did not suggest mootness but stated that even with this clarification "this is an issue to be decided by C.B.'s current IEP Team." Doc. 65 at 1.

students on the GAA, a clear violation of IDEA's guarantee of individualized

consideration. State guidelines require "IEP teams to apply in determining, on a

case-by-case basis, which students with the most significant cognitive disabilities

will be assessed based on alternate academic achievement standards." 34 C.F.R. §

200.6(d). "The identification of a student as having a particular disability as

defined in the IDEA …does not determine whether a student is a student with the

most significant cognitive disabilities…" Id. IDEA requires an individualized

determination that GAA is necessary and requires the IEP Team to discuss "why ...

the particular alternate assessment selected is appropriate for the child…" 34

C.F.R. § 300.320(a)(6)(ii).

    The ALJ ignored the lack of individual consideration that should have

invalidated the decision.  The ALJ referenced Merriam Webster Online's definition

of "significant" and found it to be synonymous with Caleb's eligibility category of

ID, citing Ga. Comp. R. & Reg. § 160-4-7-.05 App'x (e) and 34 C.F.R. §

300.8(c)(6) (defining ID). Doc. 18-13 at 2574-75. This ignores IDEA and the

ESSA provisions emphasizing removal from general testing only for the "most

significant" within the subgroup of those with disabilities, 34 C.F.R §§

200.6(A)(1)(II) and 300.160(c)("most significant").[32] C.B. argued against this

---

[32] This overinclusion may be tied to an incomplete limitation in the Georgia rule at the time, that unlike the federal rule, did not say only the "most significantly" disabled should be removed, but applied "removed" to just "students with

construction and that he was not "significantly" disabled and lost on the law. In

Doc 64, C.B. identified that Georgia added "most" to its testing definitions in

2024, while still seeking a determination overturning the holding that any child

with a cognitive impairment could be nonconsensual removed to GAA as the

overreach of the ALJ standard still requires correction.

The ALJ also found the GAA appropriate because C.B.'s IEP goals "have

modified what he is required to do," Doc. 18-13 at 2474, ¶ 18. This is a

misapplication of the IDEA/ESEA criteria for regular education test removal.

Conceptually, the testing applies to the state standards regardless of modifications

to allow judgments as to the student's progress across the instructional standards,

locating the learning of the child. See e.g., 34 C.F.R. § 200.6(b)(1)-(2). The second

arm of regular test limitation applies to the use of accommodations (not

modifications) which are provided "to ensure that all students with disabilities are

able to participate." 34 C.F.R. § 200.6(b)(2)(i))(C). Ga. Comp. R. & Reg. § 160-1-

3-1-.07(1)(h) summarizes the second removal criteria as with identified

accommodations, whether the student "[is] unable to participate in the general

assessment." See Ga. Comp. R. & Reg. § 160-1-3-.07(3)(a)(1),(3)-(6)("student is

not able to participate … even with reasonable accommodations).

---

significant cognitive disabilities." Ga. Comp. R. & Reg. § 160-3-1-.07(1)(h)
(March 25, 2021).

C.B.'s IEP contained reasonable classroom accommodations but no accommodations of any type for state assessment. Doc. 18-5 at 278, 296-7. These IEP sections are blank perhaps indicating that no discussion of the issue took place during the IEP meeting. This IEP approach reinforces the lack of individual consideration in a decision in derogation of IDEA. The ALJ holding ruling that modifications justify the GAA is outside permissible IDEA considerations. These questions continue to exist and require correction.

## CONCLUSION

C.B., Christy Greer (11th Cir.), Daniel R.R. (5th Cir.), L.H. (6th Cir.), R.O. (3rd Cir.), and Rachael H. (9th Cir.) were all children with Down's Syndrome progressing in mainstream education. They required a combination of accommodations, modifications, and supplemental services, including resource instruction, but they sought to be educated in the least restrictive environment. All contested the school's attempt to move them to more restrictive programs. C.B. has sought the individualized consideration promised by IDEA and provided by this Court to Christy Greer. That individualized approach, looking at each class, its impact on the student, IEP progress, and the guarantee of future progress, is the cornerstone of the LRE analysis.

Arguing under Greer, C.B. tried and won his case on the facts. Unfortunately, the ALJ and district court opted out of the fray, choosing to ignore

the clear evidence presented in favor of an overly simplified application of the LRE rule. The Family asks this Court to correct this error and ensure that the "school district is bound to abide by the standards…in all circumstances." <u>Greer</u> at 699. The admissible evidence supports that C.B. can be educated in the mainstream environment and that the school district's proposed program failed to provide FAPE and was not the LRE.

For the reasons set forth above, Appellants respectfully request that this Court reverse the district court's Order, Doc. 66, and remand the case to the district court with instruction to rule on Appellants' Motion for Final Judgment using the proper FAPE and LRE analysis and relying upon only admissible evidence.

Dated: July 9, 2024 and respectfully submitted,

<u>/s/ Craig Goodmark</u>
Craig Goodmark
Georgia Bar No. 301428
1425A Dutch Valley Place
Atlanta, Georgia 30324

<u>/s/ Debra Haverstick</u>
Debra Haverstick
Georgia Bar No. 159026
1425A Dutch Valley Place
Atlanta, Georgia 30324

Attorneys for Appellants

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that Appellants' Opening Brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 12,331 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

The undersigned further certifies that Appellants' Opening Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point and roman style font.

*/s/ Craig Goodmark*
Craig Goodmark
Georgia Bar No. 301428
1425A Dutch Valley Place
Atlanta, Georgia 30324

# CERTIFICATE OF SERVICE

I certify that on July 9, 2024, the foregoing Appellants' Opening Brief was filed with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will send notification of filing via email to the following counsel of record:

Megan M. Rittle – mmrittle@smithwelchlaw.com

I also certify that on this same date, pursuant to 11th Cir. R. 31-3, four copies of the foregoing document were sent by hand delivery to the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit.

Respectfully submitted this 9th day of July, 2024.

*/s/ Craig Goodmark*
Craig Goodmark
Georgia Bar No. 301428
1425A Dutch Valley Place
Atlanta, Georgia 30324